IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**ROBERT L. GALLEGOS**
        Plaintiff,

v.                                   NO. 1:13-cv-00716-JCH-RHS

**CITY OF ALBUQUERQUE, CHIEF RAYMOND D. SCHULTZ,** in his official capacity as Chief of Police of the Albuquerque Police Department for municipal claims, **OFFICER JARED FRAZIER,** in his individual and official capacity,
        Defendants.
_____

### PLAINTIFF'S SECOND AMENDED COMPLAINT
### FOR EXCESSIVE USE OF FORCE AND VIOLATIONS OF CIVIL RIGHTS
_____

The Plaintiff, Robert L. Gallegos brings this Complaint for violation of his civil rights, and for municipal liability and alleges the following.

### A. PARTIES

1.    Plaintiff, **Robert L. Gallegos** is a citizen and resident of Santa Fe County, State of New Mexico

2.    Defendant, **City of Albuquerque** is a political subdivision and governmental entity of the State of New Mexico that employs and is charged with exercising direct supervisory control over all Albuquerque Police Department ("APD") Defendants during the period of time relevant to this Complaint by and though its Mayor, Richard Berry and its Chief of Police, **Raymond D. Schultz**.

2.1     The City of Albuquerque (the City) is responsible for the hiring, retention, training, supervision, investigation, and discipline of its police officers and supervisors and for both on and off duty.

2.2     Defendant, Chief of Police **Raymond D. Schultz** ("Chief Schultz") is responsible for the efficient conduct and operation of APD and all hiring, retention, training, supervision, investigation and discipline of APD officers.

2.3     Chief Schultz is responsible for the promulgation and implementation of all policies, procedures, customs and usages of APD, including supervision and correction of customs and procedures that cause harm to persons or property.

2.4 APD is accredited through the Commission on Accreditation for Law Enforcement Agencies. This accreditation standard requires APD to achieve higher standards than non-accredited departments.

3.      Policies and procedures promulgated by APD are contained in the Standard Operating Procedures ("SOP"), General and Special Orders, as well as in certification and re-certification credentialing process including for specific police duties.

3.1     The SOPs, including General and Special Orders, are written directives issued by the Chief of Police, as authorized by the City of Albuquerque, and are in full force and effect from the date promulgated until rescinded or amended by Chief Schultz.

4.      Adherence to standard APD procedures and orders by APD personnel is mandatory.

5.      At all relevant times, Chief Schultz was responsible for enforcing the regulations of the APD and for ensuring that APD Officer Frazier obeys the laws of the State of New Mexico and the United States.

6.    At all relevant times, Defendants, Chief Schultz, and Officer Frazier were APD police officers and were acting in such capacity as the agents, servants, and employees of the APD.

7.    At all times relevant hereto and in all their actions described herein, Defendants Chief Schultz and Officer Frazier were acting under color of law and pursuant to their authority as certified and credentialed police officers and police officials.

## B. JURISDICTION AND VENUE

8.    Upon information and belief all defendants are residents of Bernalillo County, New Mexico.

9.    This action is brought pursuant to 42 U.S.C. §1983 and §1988 and the Fourth, Fifth, Eighth and Fourteenth Amendments of the United States Constitution.

10.    Jurisdiction is founded on 28 U.S.C. §§ 1331 and 1343(1)(2)(3)(4) and statutory and Constitutional provisions.

11.    This action is brought pursuant to 42 U.S.C. §1983 the Constitution, statutes, and laws of the United States.

11.1    Each Defendant's acts of omission or commission that deprived Plaintiff of his well established rights or privileges as so secured.

11.2    The conduct of each Defendant officers deviated from the stated standard of ordinary care, which level of care increases as the risk increases.

12.    Prior to June 5, 2012 the City was on notice that it has systematically engaged in a pattern of conduct amounting to implementation or execution of a policy statement, ordinance, regulations, or decision officially adopted, ratified, authorized and promulgated

Plaintiff's Second Amended Complaint

3

by Chief Schultz that caused Plaintiff's constitutional right to not be deprived of liberty without due process of law, to not be subjected to an unreasonable search, and to not be subjected to the use of excessive force during arrest, and as used to obtain a search, to be violated.

12.1   The City and Chief Schultz's long-standing pattern of conduct of failing to investigate to prevent and to properly discipline its police officers to prevent recurring violations of civil rights constitutes a custom, decision, or policy of conscious disregard for the consequences of their actions establishes they have a deliberate indifference to the constitutional rights of persons with whom the police come into contact and as occurred with Plaintiff.

12.2   The City and Chief Schultz's deliberate indifference as to their own investigatory and supervision procedures constitutes a pattern of conduct structured to curtail disciplinary actions and to stifle investigations into the credibility of officers though the willful exclusion of evidence, failing to discipline false or misleading police witness testimony, (including through inaccurate report writing) and failure to formally track and act on complaints for individual officers and as occurred in this case.

13.   This Court has jurisdiction over the parties and subject matter.

14.   **Venue is mandatory in Bernalillo County, New Mexico**, as under 42 U.S.C. §1983 all of the events or omissions occurred in Bernalillo County, and upon information and belief all natural Defendant persons are residing in Bernalillo County where they are employed by the City of Albuquerque (City).

15.    The City is a person under 42 U.S.C. §1983 whose municipal residence is in Bernalillo County.

16.    Venue is proper in this Court.

17.    There may be persons who are currently identified as police officers that, either facilitated and participated, facilitated and assisted, or directly engaged in conduct contributing to Plaintiff's injuries, or deprived Plaintiff of rights, privileges or immunities secured by the Constitution or United States law under color of law that may be added as defendants as discovery proceeds.

## C.  GENERAL FACTUAL ALLEGATIONS

18.    On June 5, 2012 Plaintiff was 22-year-old male, weighed 140 pounds, and was five feet and five inches in height, and was carrying a backpack containing his billfold, Oakley sunglasses, an IPhone, miscellaneous items and $400 in cash recently withdrawn from his bank account to pay on a debt the next morning.

19.    On June 5, 2012 Plaintiff safely traveled on his motorcycle from his residence on the far West Mesa to his girl friend's house, a distance of not less than 18 miles in traffic, after sunset without incident.

20.    Plaintiff's trade is that of a highly skilled painter in automotive shops requiring the use of his arms and shoulders in repetitive movements for long periods.

21.    At approximately 9:45 pm on June 5, 2012 Plaintiff left his girlfriend's residence on his motorcycle and was subsequently Eastbound on Indian School Road.

22.     While traveling Southbound on Tramway, Plaintiff clipped the rear of a van driven by Dawn Davis when she failed to yield the right of way to Plaintiff when she turned left, heading onto Cloudview from Tramway Northbound.

23.     APD Special Departmental Oder 12-26 states:

> "All sworn personnel will record each and every contact with a citizen during their shift that is the result of a dispatched call for service, arrest warrant, search warrant or traffic stop."

24.     911 Operator records show the time of the collision as 21:49 based on telephone calls from the public.

25.     As a result of the collision Plaintiff suffered severe road rash from 30-35 per cent of total body area (equivalent to 3rd degree burns), concussion, some degree of separation of the left shoulder acromioclavicular joint (AC) requiring surgery, broken foot, acute kidney failure, and severely sprained ankle all of which required immediate hospitalization.

26.     The shoulder injury will require future additional surgeries.

26.1     Upon information and belief the shoulder has suffered a percentage of permanent dysfunction that affects Plaintiff's performance of his livelihood.

27.     The road rash areas evidence permanent keloid scars and are sensitive to sunlight.

28.     Plaintiff was hospitalized for six days and treated with morphine and oxycodone for severe pain.

29.     Plaintiff's out of pocket expenses for medical care are substantial and ongoing.

30.     No traffic citations were issued to Plaintiff as a result of the crash.

31.     Subsequent to the crash scenario, Officer Frazier and Officer Allred had contact with Plaintiff.

     31.1    Officers Frazier and Allred lapel cam videos show Plaintiff's hands, shoulders, arms, were visibly bleeding due to skin abrasion from road rash, that his shirt was shredded, jeans torn, and he was barefoot as his socks and shoes were torn off in the collision.

32.     Plaintiff contends the videos show only part of Officers Frazier and Allred's contact with Plaintiff, and although not completely documented, shows Plaintiff was in extreme pain and angry.

33.     911 and dispatch operators document that Plaintiff attempted to seek help in an adjoining neighborhood by knocking on doors giving his name, stating he was in a collision and pleading for help.

     33.1    Plaintiff contends the 911 calls show he was shocked and confused from being injured in the collision.

34.     One 911 call was from a person at the residence of 13200 Westview at 22:04 who was reported as relating the following:

     "Male subject banging on door and has blood all over his arm. Subject
     is WMA, 19 YOA, 505, Drk Clothing, backpack."

35.     The 911 callers documented Plaintiff was wearing a backpack; he was bleeding and appeared to be confused (from statements made by Plaintiff while requesting help) and this information was relayed by APD dispatch operators to responding police officers that included Officer Frazier among numerous other responding police officers.

36.     Officer Rogillo, who upon information and belief according to police procedure, was the first responder requested an ambulance.

36.1    When the Albuquerque Ambulance Service arrived at Plaintiff's location attended by Officers Frazier, Allred and Rogillo (among numerous others) paramedics Logan Phillips and his partner, Rachel Winnepkamp stated they were commanded to leave by an officer who appeared to be in charge.

37.     Exactly when the ambulance was sent away and by which police officer is not clear, however, after the ambulance was sent away, Officer Frazier continued to deny Plaintiff medical care.

37.1    Plaintiff is heard on Officer Frazier's lapel cam video pleading to not let the ambulance go and he is requesting to go to a hospital because he is injured.

38.      Plaintiff repeatedly exercised his right to refuse to answer questions aggressively put to him by Officer Frazier and Officer Rogillo.

39.     Plaintiff's injuries were openly visible, he was bleeding from road rash, was continually requesting medical assistance, and he stated his foot was broken as documented by the lapel cam videos.

40.     By the fact that he was the arresting officer for DWI, Officer Frazier was required to tape–record all his contact with Plaintiff.

40.1    Officer Frazier did not document all his contact with Plaintiff by using his lapel cam video.

40.2    Officer Frazier did not report to APD there was any problem with the operation of his lapel cam in the manner required by APD order 12–26.

41.    APD order 12-26 mandates lapel videos be preserved for 120 days.

42.    APD General Order, SOP 1-39 states situations when lapel videos must be tagged into evidence.

    42.1    Those situations include when the City is notified of a complaint or there is an arrest.

    42.2    Both instances occurred in this case.

43.    APD Order 1-39–1 A. states: "It is the responsibility of the primary officer to ensure that the incident will be recorded in its entirety."

44.    APD 1-39-2 states: "All recordings listed above and/or contacts where an arrest was made will be tagged into Evidence and will be listed on the report as being tagged."

45.    The City received notice of a potential civil claim from Plaintiff with 120 days of this arrest.

    45.1    Upon information and belief, neither the City nor Chief Schultz subsequent to Plaintiff giving the City notice of his claims, notified any of the APD officers at the scene of arrest of Plaintiff, but in particular Frazier and Allred, to preserve their lapel cam videos, or dash camera video, or belt audio evidence.

46.    DWI Officer Jared Frazier logged in with Dispatch at 22:13:46 that he was on the scene and stated in his DWI Report that his lapel camera failed to initially engage.

    46.1    Officer Frazier's lapel video cam time stamp shows the time video operation was engaged as 22:08.

47.    Officer Frazier did not report his lapel cam video malfunctioned.

48.     Officer Frazier's lapel camera subsequently worked documenting Plaintiff's repeated pleas for medical assistance.

49.     After three minutes of attempting to have Plaintiff give incriminating evidence against himself, Officer Frazier said to Plaintiff: "You're now back under arrest."

50.     Officer Frazier failed to properly engage his lapel camera to document that he ever gave Plaintiff the Miranda Warning or that Plaintiff ever waived Miranda.

51.     No documentation of any officer giving Plaintiff the Miranda Warning exists.

52.     In violation of APD's 12-26 policy Officer Frazier failed to report the malfunction of the lapel camera.

53.     Officer Frazier knew or should have known, Plaintiff was injured and was being denied medical care.

54.     At 22:09:21 on a lapel cam video Plaintiff stated:

        "I am hurting."

55.     At 22:09:27 a lapel cam video documented Plaintiff stated:

                "Albuquerque cops are famous for shooting, right, you are supposed to kill

                me." Frazier responds by saying: "Your suicidal."

56.     At 22:10:29 Plaintiff says:

                "Please take me to a hospital where someone can look at my ankle. I promise

                you it is broken."

57.     At 22:11:42, after being denied medical treatment by the medical paramedics, Plaintiff stated: "Ok. Ok, give me a breathalyzer I want it as soon as possible."

58.    Plaintiff contends Officer Frazier pulled on his arm to bring Plaintiff to a standing position and such action was painful to Plaintiff causing him to cry out that is documented by lapel cam video.

59.    At this time, Plaintiff was handcuffed with his bloody arms behind him and his bloody palms facing out.

      59.1    Given Plaintiff's visible injuries, this particular manner of restraint and handling by Officer Frazier was abusive as this maneuver caused Plaintiff to cry out from the pain from his shoulder separation.

60.    Upon information and belief, the AC injury was likely aggravated by Frazier's handling of Plaintiff at the time of arrest, and by the manner of transport of Plaintiff in Frazier's vehicle and by subsequent handling.

61.    At the May 8, 2013 hearing on Plaintiff's Motion to Suppress the breathalyzer test in Metropolitan Court, Officer Frazier testified he took responsibility for Plaintiff from the paramedics.

62.    Officer Frazier testified at the May 8 hearing that the paramedics examined Plaintiff and "released him."

63.    Paramedics Phillips and Winnekamp denied at the May 8 hearing they ever had an opportunity to evaluate Plaintiff's injuries because the officer who appeared to be in charge made it clear to Ms. Winnekamp they had to leave.

64.     Plaintiff was heard on Frazier's lapel audio at 22:08 immediately requesting medical aid for his ankle "before the ambulance leaves."

65.   <u>APD Prisoner Transport Unit Standard Operating Procedures: 70-04-01 Admission</u>

<u>Process at the PTC</u>[1]. States:

"D. Prior to accepting custody of the prisoner, the PTC Admissions Officer:

"1.     Will observe each prisoner for illness or **visible injury**....

"3.     MDC[2] medical staff has very strict guidelines on accepting any prisoner that is injured or complaining of any illness without a medical release from an emergency room doctor. **Prisoners being checked and cleared by Albuquerque Fire Department and Albuquerque Ambulance still require a medical doctor's clearance."** [Emphasis is by APD]

66.   Contrary to APD 70-04-01 Frazier did not obtain a medical doctor's release.

67.   Based upon the testimony of paramedic Winnekamp, Officer Frazier's DWI Offense Report falsely states:

"Mr. Gallegos was checked out by Albuquerque Ambulance and released to me from the scene."

68.   Based upon the testimony of the paramedics, Officer Frazier's Report falsely states:

"I then contacted Mr. Gallegos who had just been treated at the scene."

69.   Officer Frazier's DWI Report states:

"Mr. Gallegos was placed back under arrest for DWI and transported

to the PTC where a twenty minute deprivation period was observed."

70.   At his oral interview, when Officer Frazier realized there was a discrepancy in that the deprivation period could not have been properly completed as he stated, Frazier then

---

[1]  Transport Center
[2]  Metropolitan Detention Center

said the period began in his car during transport in violation of APD DWI policy adopting the NHTSA SFST student manual.

71.    Officer Frazier's DWI Report stated:

> "That Mr. Gallegos was read the New Mexico Implied Consent Advisory, which he stated he replied he understood and agreed to submit to a breath test…"

71.1   Plaintiff denied that he was ever read the Implied Consent Advisory.

71.2   This alleged consent by Officer Frazier is undocumented by Officer Frazier's Lapel Cam or, upon information and belief by any other type of documented corroborating evidence.

72.    After Plaintiff was placed in Officer Frazier's patrol car, Officer Frazier failed to use his lapel cam to document further contact and interaction between himself and Plaintiff during the transport to the PTC and thereafter.

73.    Officer Frazier began the booking process for Plaintiff at the PTC.

74.    Upon arriving at the PTC Plaintiff continued to state to Officer Frazier that he was in pain, his ankle was broken and he wanted medical care.

75.     Plaintiff contends Officer Frazier repeatedly promised Plaintiff that after he took the breath test Frazier would call an ambulance, contrary to <u>APD Procedural Order, 2-14, Arrests, Arrest Warrants, and Booking Procedures</u>:

> "9.    **Officers are cautioned from using the promise of release to obtain confessions or incriminating evidence.** <u>Whenever possible</u>, **officers will tape record conversations with suspects concerning release.** Officers will not release a person once a formal complaint has been filed in Metropolitan Court." [Emphasis is by APD]

76.     Officer Frazier's complaint in Metropolitan Court is dated June 5, 2012.

     76.1   Officer Frazier notes at the very end of his DWI Report that Plaintiff was injured, for which Frazier called an ambulance.

77.     Judge Jaramillo excluded the breath test from use as trial at the May 8, 2013 hearing in *Sate v. Robert Gallegos, Bernalillo County, Albuquerque Metro Court, Case Number DW–227012*, finding that APD officers deliberately withheld medical attention from Plaintiff to obtain and illegal search, i.e., breath test.

78.     Plaintiff testified at the May 8, 2013 Hearing that he was told by police officers he would be denied medical care unless he consented to a breath test.

79.     Plaintiff stated at the May 8, 2013 Hearing he was never given the Miranda Warning.

80.     Plaintiff testified at the May 8, 2013 Hearing he never waived the Miranda Warning.

81.     Frazier testified that he was unaware of Plaintiff's injuries due to poor lighting at the scene.

     81.1   The headlights from several cars as well as officers holding flashlights can be seen from the short time lapel videos were in use.

82.     Officer Allred testified at the May 8, 2013 hearing that the arrest scene was lit up like daylight.

83.     At the Prisoner Transport Center both the Fire Department Rescue and Albuquerque Ambulance responded and documented in their Incident and Patient Care Reports the extent of Plaintiff's obvious injuries.

84.     At 23.33 AFD arrived at the PTC and its Pre-hospital Care Report stated:

**"E. Due to extent of road rash, I feel that the pt should have been**

**transported by the initial AAS unit."**

Reported by AFD Lt. Theodore E. King.

85.   Defendant continued to ask for an ambulance while a prisoner at the PTC.

85.1   As to all events occurring at PTC, those Personnel are material witnesses

as to what occurred there to interrupt the booking process.

86.   At 23.35 Albuquerque Ambulance Service also arrived at the PTC and assessed

Defendant as having suffered major trauma (i.e., code 43) with a fracture or dislocation to

the right ankle, pain from road rash, and loss of blood from road rash (by Andrew Schneider

and Marian Irene Weinmann).

"After it was determined that pt had such a high body area of abrasions

and right and left flank pain, pt was loaded and transported without delay

to UNMH. Exact total blood loss unknown. Pt reported being cold in

transport and was covered with a blanket."

87.   The City and Chief Schultz were on actual notice prior to June 5, 2012 of prior

incidents of excessive use of force, failures to investigate, including to preserve evidence,

and failures to discipline, amounting to an APD policy or custom of deliberate indifference

to citizens' Constitutional rights.

87.1   Two letters from Plaintiff to Mayor Berry, in August 2012 and June 2013, put

the City on written notice in this case as to the denial of medical care and other

conduct as civil rights violations.

87.2    A factual determination that a pattern of longstanding police and City conduct amounting to a culture of deliberate indifference to constitutional rights is a condition precedent to any Department of Justice investigation.

87.3    The Department of Justice current investigation is evidence supporting Plaintiff's contentions herein that the City and APD were on notice of a long–standing pattern of conduct depriving citizens of constitutional rights of the type alleged by Plaintiff.

88.    The City had actual and constructive notice from the involvement of its Assistant City Attorney (Kathryn Levy) appearing on behalf of the City in the Metro Court criminal case proceedings where she was aware of Plaintiff requests for discovery supporting his allegations of specific facts of officer culpability.

88.1    By not timely turning over the complete CAD written reports and tape recordings of the 911 and APD dispatch calls, the City actively obstructed Plaintiff's discovery.

88.2    This discovery abuse conduct by the City was consistent with a policy of hindering investigations by discovery into the credibility of officers, and with a policy of covering-up officer misconduct.

89.    Having been put on notice of Plaintiff's allegations of constitutional depravations, the City and Chief Schultz failed to act or to investigate, enforce procedures, or discipline consistent with prior policy and custom of deliberate indifference to civil rights violations.

90.  **Notice from public excessive use of force complaints and lawsuits:** A December 12, 2012 Albuquerque Journal article states as fact that since 2010 APD has shot at 26 men, striking 24 and killing 17.

   90.1   Shootings are but one form of excessive use of force when it is unjustified.

91.  APD Sgt. Cassandra Kukowski documented repeated excessive use of force by officer Conner Rice and Shad Rice and subsequently one by officer Ronald Surran in her June 1, 2012 memo to Internal Affairs.

   91.1   Only after the Albuquerque Journal investigated was the offending officer (Rice) charged with assault and battery. Prior to that APD deliberately failed to investigate.

   91.2   As a result of the Rice scandal, Chief Schultz announced that only deputy chiefs would review and look at lapel videos and evidence.

92.  The November 2010 shooting of Russell Tenorio resulted in a settlement in federal court.

93.  The following cases are direct indicia of notice to the City of Albuquerque and Chief Schultz that APD Officers frequently use excessive force:

   93.1   Wharton v. City of Albuquerque, D-202-CV201006590.

   93.2   James v. Chavez, 10th Cir. Fed Court of Appeals, No. 11-2246.

   93.3   Lundstrom v. Romero, 616 F.3d 1108 (10th Cir. 20101).

   93.4   Buck v. City of Albuquerque, 549 F.3d 1269 (10th Cir. 2008).

**Plaintiff's Second Amended Complaint**

93.5     Canizales v. Lovatos, et al.,

93.6     Ann Henry v. Albuquerque Police Department, No.01-2297 10th

Circuit.

93.7     Betts v. City of Albuquerque, 90-CV-779.

93.8     Goff v. Heatley, 95-CV-1508.

93.9     Smith v. City of Albuquerque, 01-CV-416.

94.     The City of Albuquerque and APD were on notice of APD Officers frequent use of excessive force in a February 6, 2012 YOU-tube video of brutality by officer Andrew Hsu picking a fight after the suspect (Jayson Bernard) was handcuffed – no criminal charges filed due to video made by public and released to news media.

95.      The City of Albuquerque and APD were on notice of APD Officers frequent use of excessive force by Detective Economidy's face book posting that his job was "human waste disposal," (in response to killing by him made after a traffic stop) as reported by the Albuquerque Journal on February 15, 2011.

96.     The City of Albuquerque and APD are on notice of APD Officers propensity to justify the excessive force as the APD's Repeat Offender Project used a hangman's noose as the unit's symbol.

97.     The City of Albuquerque and APD were on notice of APD Officers frequent use of excessive force from Officers Doyle and Woolever's conduct.

97.1    These officers were initially cleared by APD for no wrongdoing in beating a

suspect captured on lapel video, because "the officer saved his life by not shooting

him."

97.2    Thirteen kicks to the head were not justified as reported by the Albuquerque

Journal on November 17, 2011.

98.    According to Eye On Albuquerque, an August 2, 2013 report states from 2007 to

2011, 871 officers were involved in at least one use of force incident and "APD's blue code

of silence is … augmented by actual rules of conduct in the department's standard operating

procedures that disallow any officer from documenting in writing misconduct."

99.    Realcrimes.com hosts a website styled: "New Mexico Citizens Live in Fear of Their

Police" consisting of 14 pages of cases and public announcements as that include unlawful

APD officer conduct similar to that which occurred to Plaintiff.

99.1    This blog documents APD conduct as to excessive use of force  from arrestees

from 1980 through 2005 as taken from Albuquerque Journal Articles, actual lawsuits

and other public sources.

100.    The Wall Street Journal on February 12, 2013 quoted Chief Schultz as stating:

"Officers act differently when they know they are being recorded" reacting to

the Department of Justice investigation.

101.    Chief Schultz also asserted that his APD policy of requiring officers to use lapel

cameras will deter them from using excessive force and may provide them with a video

defense against accusations that they behaved improperly.

**Plaintiff's Second Amended Complaint**

102.   The use of the lapel cam videos is an investigation tool for Chief Schultz.

103.   The lapel cam video is a necessary component of Chief Schultz's performance of his duty to investigate as it gathers evidence necessary to document prohibited activity.

103.1   Unless the lapel cam video evidence of depravations of constitutional rights is gathered and preserved in practice, grounds for investigating an event and upon which Chief Schultz may base and disciplinary action, and to prevent or deter future depravations of constitutional rights by his officers, are missing.

104.   While Chief Schultz states the policy of requiring officers to use the belt audio or lapel cam videos is designed to protect APD and its officers from citizen complaints and lawsuits, the absence of enforcement of that policy by Chief Schultz is consistent with a Blue Code of Silence being the operative policy mechanism to justify patterns of conduct resulting in Plaintiff's civil rights depravations.

105.   Upon information and belief, Chief Schultz acted consistent with his policy of not disciplining Officer Frazier for failing to comply with the lapel camera policy to document all contact with a citizen, in particular an arrestee, in this case Plaintiff.

106.   The April 28, 2013 Albuquerque Journal front page article styled, "APD Changes Truth policy, More discipline options for officers who lie," the new policy "Truth Policy" showed officers will be disciplined less for lying, for misrepresentations on incident reports, and for misrepresentation in criminal complaints and in testimony.

107.   This new 'Truth Policy' is evidence of the City's prior knowledge of its unwritten policy condoning and ratifying such longstanding practices of officer's misrepresenting facts,

in reports or in Court testimony, failure to give Miranda Warning, and to gather and preserve evidence favorable for a Defendant.

107.1   The former written policy of non-tolerance for lying on a police report or in a criminal investigation is now, under the new so-called Truth Policy, only a lower level 5 offense, which more nearly reflects the practice of condoning officer misstatements and evidentiary type misconduct.

107.2   Such Policy is in contradiction to <u>General Orders, 1-4, Personnel Code of Conduct, Rules 104-1, U and W</u> and APD Cadets' Honor Code of not tolerating lying of any kind at any time.

108.   Chief Schultz has failed to exercise his duty to investigate Plaintiff's claims and his supervisory authority to discipline Officer Frazier for engaging in conduct violating Plaintiff's civil rights.

108.1   Consistent with the City and Chief Schultz's custom of not investigating and disciplining for civil rights depravations Officer Frazier's conduct in this case did not result in discipline from the City or Chief Schultz.

109.   **Facts of actual notice for standards of police conduct:** By federal and state laws, including Constitutions, statutes, case law, New Mexico Department of Public Safety course curriculum and Law Enforcement Academy mandated certification and recertification standards, and by APD's own rules, regulations, polices, procedures and general and special orders, Chief Schultz was on notice of the following minimum standards for officers to obey.

"**A.**    An Officer shall:

> **(1)** obey all laws of the United States, or any state and local jurisdiction in which the officer is present;

> **(2)** obey all rules and regulations, policies, procedures, directives and lawful orders  issued by supervisors; and

**B.**   Officers shall satisfactorily perform their duties and assume the responsibilities of their positions. Unsatisfactory performance may be demonstrated by violating any one of the following provisions:

> **(1)** a lack of knowledge of the application of laws required to be enforced;

> **(2)** an unwillingness or inability to perform assigned tasks;

> **(3)** the failure to conform to work standards established to the employees rank, grade or position as set forth in the job specifications[3]."

110.   APD's standards are set forth in APD, General Orders, 1–04, "Personnel Code of Conduct."

> "1.04–1 E. personnel shall not commit or omit any acts which constitute a violation of any the rules, regulations, directives, or orders of the department."

111.   Plaintiff's attempt to timely file a complaint in person with the Police Oversight Commission (POC) was refused by the POC.

---

[3] N.M. Admin. Code § 10.5.100

**Plaintiff's Second Amended Complaint**

111.1  Upon information and belief, due to conflicts in POC leadership and budgeting issues, the POCs ineffectiveness is a component contributing aspect of suppressing investigation information for excessive use of force by Chief Schultz and the City.

111.2  Professors Sam Walker and Eileen Luna concluded Albuquerque's citizen complaint system was ineffective in their 1997 Report on the Oversight Mechanisms of the APD. As a result the Police Oversight Commission (POC) was created with the position of Independent Review Officer (IRO).

112.    As to the POC's operation by the City, Peter Simonson with the American Civil Liberties Union stated as fact in <u>Alibi.com</u> on August 18–24, 2011 that: "My observation is that it (POC) has not been very effective in addressing overreaching police abuse."

113.    **Review of Use of Force in The Albuquerque Police Department.** On June 23, 2011 the *Police Executive Research Forum* (PERF) published its Report which was a review of APD practices, policies and procedures, primarily pertaining to training, supervision and discipline regarding use of force issues as requested by the City.

114.    The PERF Report noted its analysis relied on APD's representation that it used 1) dash cameras, 2) audio recorders, and 3) lapel cameras for proper investigation of complaints, particularly as to use of force.

115.    The PERF Report's comment on the Chief Schultz's stated policy for mandating use of audio recording or lapel cameras is:

**"In confrontational situations, the factual confirmation of events captured by these cameras is a huge step forward and provides the department's supervisors and managers (as well as prosecutors an court) <u>undeniable evidence</u> of how an incident evolved and the actual depiction of the visual point of view of the officer."**

116.    The PERF Report recommends the following course of action for APD to properly address the numbers of violent incidents involving officers:

> "The APD needs to collect more complete and more detailed data on violent incidents involving officers."[6]

> "b.   Not all use–of–force events involve the use of a weapon (by officers and/or suspects). The current date form used by APD does not allow a distinction between incidents where a weapon was not involved and incidents where weapon information is missing. …

> "d.   Data is also missing about why force was used. This field apparently **was not completed in 40 percent of cases**. Therefore it is difficult to reach conclusions about whether there are changes over time in why officers use force."

117.    The use of the audio equipment and lapel video cameras was instituted by Chief Schultz and the City as their investigation mechanism …

> **"designed to manage officers' use of force"…, and to document "interactions between officers and the person they meet[4]."**

118.    The Albuquerque Police Officer Association (APOC) conducted a survey released on December 12, 2012.

---

[6] PERF Report page 31
[4] PERF Report; pages 2, and 6.

**Plaintiff's Second Amended Complaint**

24

119.    The APOC Survey showed 93.9% of 443 responding officers reported 62.8% or 278 responding said they had not been significantly trained to deal with lapel cameras and use of force. Not all of the survey was made public.

120.    It is axiomatic then that in order to supervise and discipline police officers for depravations of citizens' constitutional rights, the City and APD through Chief Schultz, must have in place sufficient mechanisms for managing over 1,000 police officers.

121.    The City though Chief, Ray Schultz, as the chief policy maker, is responsible for implementing and overseeing those mechanisms of review in order to properly supervise and discipline his officers to prevent them from engaging in depravations of constitutional rights, or to discipline them for doing so.

122.    Chief Schultz is responsible for investigating and disciplining officers based upon his mechanisms of review that depend on accurate and complete information in his officer's reports, including by the reports of misconduct by other police officer's, and citizen complaints.

123.     While the City and Chief Schultz may maintain that they have valid policies and procedures to prevent constitutional depravations, long–standing practices as noted, and continuing circumstances of Plaintiff's incident show those policies are unconstitutionally applied by the City, and Chief Schultz.

124.    All conditions precedent have been performed or have occurred, or are waived.

## D. FIRST CAUSE OF ACTION
## DEPRAVATION OF CIVIL RIGHTS UNDER 42 U.S.C.A. § 1983

### BY EXCESSIVE USE OF FORCE CONSTITUTING CRUEL AND UNUSUAL PUNISHMENT ALSO USED TO SECURE AN UNLAWFUL SEARCH

125.    The factual allegations contained in each of the preceding paragraphs herein are hereby incorporated by reference, as if fully set forth herein.

126.    As a citizen, Plaintiff has a substantive and due process right to be free from cruel and unusual punishment before, during and after arrest under the Eighth and Fourteenth Amendments to the United States Constitution

127.    Plaintiff has a substantive and due process right of access to the courts as a privilege and immunity under Article IV of the United States Constitution and the Fourteenth Amendment Due Process Clause, and the right to petition the government as granted by the First Amendment.

> 127.1  The City and Chief Schultz's conduct condones Officer Frazier's practice of selective investigation and reporting of facts, and misrepresenting facts, to support conviction and that avoid attacks on his credibility that denied Plaintiff access to evidence.

128.    As a citizen, Plaintiff has a substantive and due process right to be free from unlawful searches and seizures under the Fourth and Fourteenth Amendments to the United States Constitution.

129.    As a result of constitutional depravations several pending criminal charges against Plaintiff were dismissed showing that the violations were not harmless but in fact qualify in law as "outrageous" because the APD disregarded its own rules, violated the law, and acted with deliberate and conscious indifference for Plaintiff's constitutional rights.

130.    Plaintiff, as a pre-trial detainee and prisoner, has a federal constitutional right to

timely medical care for his serious injuries in that the Eighth Amendment protects citizens from "unnecessary and wanton infliction of pain.[4]"

131.   At the time of his warrantless arrest, Plaintiff was unarmed, helpless, suffering extreme pain and disability from his extensive injuries and in no way posed a threat to any Defendant police officer or any other person.

132.   Officer Frazier had a duty to not inflict further pain and suffering constituting cruel and unusual punishment of Plaintiff by denying him timely medical care while Plaintiff was under arrest or was under APD's care, custody and control.

133.   Officer Frazier was under a duty to secure Plaintiff's wellbeing by keeping Plaintiff safe, which duty required providing access to immediate medical treatment.

134.   Officer Frazier used excessive force in handling Plaintiff pursuant to his arrest.

135.   This excessive and unnecessary physical treatment of Plaintiff by officer Frazier was brutal and cruel and unusual punishment subjecting Plaintiff to great pain and aggravated his road rash injuries, loss of blood, loss of plasma, aggravation of the shoulder AC joint separation, and the injury to his broken and sprained ankle.

136.   Officer Frazier's actions were willful, malicious, and deliberately intended to deprive Plaintiff of his constitutional right to be free from excessive use of force pursuant to an arrest.

137.   The act of allowing the ambulance to be sent away and depriving Plaintiff of medical care while Plaintiff was still handcuffed, was in pain, and was requesting medical treatment

---

[4] *Estelle v. Gamble*, 429 U.S. 97, (1976) as applied to pretrial detainees under *County of Sacramento v. Lewis*, 523 U.S. 833 (1994) and such denial was for an ulterior purpose under *Egebergh v. Nicholson*, 272 F.3d 935 (7th Cir. 2001)

caused mental anguish and emotional distress and was cruel and unusual punishment.

138.    The denial of medical care constitutes excessive use of force and was cruel and unusual punishment.

139.    Excessive use of force occurred by denial of medical care when used to coerce Plaintiff's consent to an unlawful search when Plaintiff was in great pain and suffering from his injuries.

140.    Officer Frazier's actions were willful, malicious, and deliberately intended to deprive Plaintiff of his constitutional right to be free from an unlawful search by the use of excessive force used to coerce a consent to an unlawful search resulting in an unlawful confession.

> 140.1  Officer Frazier's failure to document the giving of the Miranda Warning shows his intent to circumvent Miranda in order to coerce consent to a search to obtain a conviction.

141.    Officer Frasier's conduct was objectively unreasonable because the withholding of medical care was excessive, outrageous, wanton, willful, cruel and unusual punishment, and in complete disregard for the safety of Plaintiff and therefore deviated from the standard of care ordinarily exercised by a reasonable prudent and qualified officer in light of the nature of the circumstances.

> 141.1  Officer Frazier could easily have accommodated Plaintiff's injuries by allowing his transport by paramedics to a hospital and where the taking of blood sample could occur.

142.    Officer Frasier's conduct was not objectively reasonable in that it deprived Plaintiff of well-established constitutional rights under the Fourth and Eighth Amendments that he

had a duty to observe.

143.    At all relevant times, Officer Frazier was without just and legal cause for denying Plaintiff timely medical care as cruel and unusual punishment.

143.1  The manner in which this denial occurred constitutes the use of excessive force underpinning the constitutional depravations suffered by Plaintiff.

144.    Plaintiff was the victim of punishment administered in a grossly disproportionate manner to his acts.

145.    Plaintiff should be awarded exemplary damages because the officer's conduct was outrageous and it shocks the conscious.

146.    **Municipal Liability:** The aggravation of Plaintiff's personal injuries and depravation of civil rights was caused by actions taken, acquiesced in, or condoned either pursuant to municipal policy as set forth in this complaint.

147.    Chief Schultz's supervisory omissions include failure to investigate and correct unconstitutional practices and conditions set forth in this complaint.

148.    The City and Chief Shultz breached their duty to exercise their power available to them to investigate Plaintiff's allegations of fact, of which they were on actual notice.

149.    By not investigating Plaintiff's allegations the City and Chief Schultz breached their duty to enforce APD policies that were consistent with the Rule of Law to prevent constitutional depravations.

150.    There is a failure of training by Chief Schultz to prevent constitutional violations that includes the use of lapel cameras as a critical tool of investigation.

151.    Chief Schultz' consistent failure to use his power to enforce the gathering of relevant police misconduct information through proper report procedures, or to investigate, to supervise (including by training), or to discipline to prevent recurring deprivations of federal constitutional rights constitutes the deliberate indifference to Plaintiff's constitutional rights.

152.    Therefore, the pattern of conscious indifference to the depravations of citizens' constitutional rights by the City, and Chief Schultz was a primary cause of the depravations of Plaintiff's civil rights.

153.    There has been a violation of 42 U.S.C. §1983 by Officer Frazier and Chief Schultz.

154.    At all times herein the above alleged facts show Officer Frazier, acted willfully, maliciously and with a conscious disregard for the rights, safety and condition of Plaintiff supporting an award for punitive damages.

155.    WHEREFORE, Plaintiff prays for judgment against the City and against Officer Frazier as follows:

A.      Compensatory damages to Plaintiff in an amount awarded by the jury, for his injuries including but not limited to the aggravation of the AC injury to the shoulder, including pain and suffering, future surgeries and permanent disability, and for infliction of emotional and mental distress.

B.      General Damages in an amount to be awarded by the jury.

C.      Punitive damages against Defendants as shown at trial, and as allowed by law.

D.      Awarding Plaintiff the reasonable costs and expenses of this action, including necessary and reasonable attorney fees including under 42 U.S.C. § 1988.

E.      Pre and post judgment interest, and such other relief as may be just.

## E.  JURY TRIAL

156.    Plaintiff requests trial by jury.

## F. PRAYER

157.    Plaintiff respectfully requests the relief and damages requested herein, including necessary and reasonable attorney fees and costs, and an award of such other and further relief as this Court may deem proper.

Respectfully submitted,

/s/ Lamar D. Treadwell
Lamar D. Treadwell, Pro hac vice
Lead Trial Counsel
Not admitted in New Mexico
1127 Paseo de Peralta
Santa Fe, New Mexico 87501
505/ 660-0602 Cell
505/ 213-0094 Fax

LOCAL COUNSEL

/s/ Richard S. Mackenzie
Richard S. Mackenzie
Richard S. Mackenzie Law Firm
1127 Paseo de Peralta
Santa Fe, New Mexico 87501
505/ 982-9823 Office
505/ 982-8239 Fax
Richard@RMackenzieLaw.com

**Plaintiff's Second Amended Complaint**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this the 21ˢᵗ day of March 2014 the foregoing was electronically filed through the CM/ECF system, which caused the following counsel for Defendants to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

Trisha Walker
Assistant City Attorney
P.O. Box 2248
Albuquerque, New Mexico 87103
505/ 768-4500  (Fax) 768-4440
twalker@cabq.gov

Stephen G. French
Joel Young
French & Associates
500 Marquette NW, Suite 500
Albuquerque, New Mexico 87102
505/ 843-7075, (fax) 243-348
jyoung@frenchlawpc.com


 /s/ Lamar Treadwell
Lamar Treadwell